## L. E. PELTON *vs.* WILLIAM A. PLACE and CHARLES F. SKEELS.

### May Term, 1899.

Present: ROWELL, MUNSON, START, THOMPSON and WATSON, JJ.

Opinion filed July 25, 1899.

*Whose Deed?*—A lease which names an association as lessee and declares that in the transaction the association acts by certain of the signers as directors, is nevertheless the deed not of the association but of the signers, if it is executed in their names and with their seals.

*Whose Deed?*—It is immaterial that the signers on the part of the association act, and are understood to act, as directors and not otherwise, for, the association being unincorporated, they act for themselves as well as for their associates and are therefore bound.

*Non-joinder—Demurrer—Objection must Be Availed of at Hearing.*—An

objection for non-joinder of defendants in chancery cannot be taken by demurrer unless the defect is apparent on the face of the bill; and if the objection is made by answer to be availed of at the hearing, it must appear by the decretal order to have been so availed of, or it will be disregarded in this court.

*Parties—Some as Representing All.*—Especially should the objection be disregarded in the present case, in which the parties who might be joined are numerous and the defendants fairly represent the interests of all.

*Chancery Jurisdiction.*—Chancery has jurisdiction to enforce payment of rent upon a lease, joint and not several, in which the same party is both a lessor and a lessee, for an action at law would not lie.

*Rent Passes as Incident of Reversion.*—When a lessor quitclaims a part of the demised premises, his interest in the lease as to that part, and a proportionate share of the rent, pass as an incident of the reversion.

*Attornment.*—If afterwards the grantee lease to the original lessee, it constitutes an attornment by the lessee, and as it involves notice of the conveyance, it is good as to the rent in arrear which has accrued since the conveyance.

*Attornment.*—An attornment is not necessary under our system of conveyances, to complete the validity of an assignment of a reversion, and being thus inapplicable to our situation and circumstances, the doctrine was not adopted by our statute as a part of the common law; consequently the assignee is entitled to all arrears of rent that have accrued since the conveyance and have not been paid to the grantor in default of notice.

*Attornment.*—But if the assignee lies by and permits the tenant without notice to pay rent to the lessor as it falls due, he cannot complain; and such seems to have been the common law when the grant passed the estate without attornment, as it did by some modes of conveyance.

*How Foreclosed Lessor May Keep His Lease Alive.*—A lessor who loses his title to the demised premises by a decree of foreclosure, may at the same time take a lease of the premises from the foreclosed mortgagee, and thereby feed his own lease and be entitled to have it still performed on the part of his lessee.

*Lessee cannot Abandon because He Fears a Breach.*—A lessee cannot by anticipation, and because he fears, treat the lease as broken by the lessor because his interest is not in the first instance sufficient in point of time to feed the lease during the remainder of the term; for while the lessor is performing and does not renounce the lease, the lessee is bound to know that he may continue to perform, and must wait until the actual breach.

*Acceptance of Abandonment—Surrender of Term.*—When the lessee has abandoned the premises, the lessor cannot let them and receive pay therefor, even for a day, without accepting the abandonment and working a surrender of the term as matter of law.

*Eviction, Intent necessary to.*—A mere taking back of a portion of the demised premises by the lessor, is not as matter of law an eviction, in the absence of the requisite intent.

CHANCERY. Heard upon pleadings, master's report and exceptions thereto, at the September term, 1898, Franklin county, before *Tyler*, Chancellor, who overruled the defendants' exceptions and rendered a decree for the orator, for $79.65, with interest from June 15, 1898, and costs. The defendants appealed.

In the early spring of 1885 the defendants and others, wishing to form an association for horse training and racing, and finding that the orator and the defendant Skeels owned severally two adjoining tracts of land suitable for a course, entered into an arrangement with the orator whereby the orator and Skeels were to lease to them for the purposes of such an association; and accordingly the orator and the defendant executed agreement Exhibit A, dated March 2, 1885, and expressed to be between "L. E. Pelton and Charles Skeels on the one part and W. A. Place and his associates on the other part." By it Pelton and Skeels agreed to lease a plot therein partially described and extending so far as necessary to make the course, for the term of ten years, for use as a trotting course, and Place and his associates agreed to pay as rent $40 per year by June 15th of each year, to be divided between Pelton and Skeels in proportion to their respective ownerships in the land taken. The instrument was sealed and acknowledged by the orator and the defendants and duly recorded. Thereupon the association was completed and organized under the name of the Highgate Driving Club with the usual officers, and having ascertained the quantity of land needed, on July 2, 1885, entered into a lease with Pelton and Skeels,—Exhibit B. The instrument states itself to be an agreement "Between L. E. Pelton and Charles F. Skeels on the one part and the Highgate Driving Club by its directors W. A. Place, C. F. Skeels and Byron Tuller on the other part," but is signed, sealed and acknowledged by said individuals each in his own name alone. By its terms Pelton and Skeels "agree to lease and do hereby lease" a tract

exactly described, for the term of ten years from the second day of March, 1885, to be used as a driving course; and Place, Skeels and Tuller agree to pay Pelton and Skeels "a yearly rental of three dollars per acre by the 15th day of June, each year," and that "as between Pelton and Skeels said yearly rental is to be divided so that the said Skeels shall have fifteen dollars and said Pelton $28.93," and that if the rent remain unpaid for one month after it becomes due Pelton and Skeels may re-enter and take possession, either jointly or each of his own land. Exhibit B was also duly recorded. The master finds under objection that Place, Skeels and Tuller signed Exhibit B as directors of the club, and in no other capacity, and were thereunto authorized, and that the orator so understood it at the time. The rent was paid to July 2, 1892.

The National Life Insurance Company of Montpelier, Vermont, held a mortgage upon the orator's home farm including all the land leased by the orator to the club, except two and one-half acres known as the "Green lot." The mortgage was dated August 31, 1875, and duly recorded, but the club or the defendants did not know of its existence. It was foreclosed against the orator and all claiming under him by a decree expiring April 20, 1889, but neither the defendants nor the club were made parties.

March 31, 1890, the orator quitclaimed all his real estate including the Green lot to Marsh. The first actual notice of the mortgage decree or quitclaim deed, to any member of the club, was late in the spring of 1890.

When Place paid the orator the rent due June 15, 1890, for the year in advance, he notified the orator that the club would not pay any more rent unless the orator procured the club a lease from the Insurance Company, which the orator refused to do. July 9, 1891, Skeels for the club paid the orator to July 2, 1892, and notified him that the club would pay no more rent, but would surrender the lease when the year expired and that he, Skeels, should take back his

*28*

portion of the land, (and he did so), and that he, Pelton, would have to take his. The master is unable to find that the orator ever agreed to take back his land and release the club.

About May 23, 1892, Skeels took off the lock from the gates and they went to decay, and the track for 1892 and 1893 was left open and was not occupied by the club, but occasionally during those two years individual members of the club, including Skeels, went on to the track and drove horses there.

Up to April, 1894, the orator leased the home farm of the Insurance Company from year to year, but the leases were not recorded, and the defendants had no notice of them.

On July 4, 1893, certain parties procured the track of the orator, and used it to celebrate the day, paying him therefor four dollars. In 1894 the orator leased the home farm, of the Insurance Company, except the land covered by the track. The Insurance Company and Marsh leased to Place their portions of the land respectively.

*L. E. Pelton, the orator, pro se.

C. G. Austin for the defendants.

ROWELL, J. In the lease of July 2, 1885, which is the foundation of the suit, the orator and the defendant Skeels are lessors, and The Highgate Driving Club is named as lessee, and as acting in the transaction by the defendants and Tuller, its directors. But the instrument is not the deed of the Club, for it is not executed in its name nor sealed with its seal, but is signed and sealed by the defendants and Tuller in their individual capacity only. The master has found on parol testimony objected to, that they in fact signed as directors and not otherwise, and were thereunto authorized, and that the orator so understood it at the

---

*The orator, who was ninety-two years old March 28, 1899, and admitted to the bar in 1832, made his own brief, and argued his case alone.—[REPORTER.

time. But it is not necessary to decide whether the parol
testimony was admissible or not; for if it was, as it appears
that the defendants were themselves members of the Club,
and does not appear that the Club was anything more than
a voluntary association without corporate existence, in
acting for the Club they acted for themselves as well as for
the other members, and therefore bound themselves. The
case then, at most, is one of nonjoinder of defendants, if
indeed it is even that, as the bill is based upon the lease,
which is under seal, and does not name any other persons
who should be defendants. The defendants demurred in
their answer for misjoinder of defendants, as we construe
the pleading, and we suppose the demurrer was seasonably
brought on and overruled, though the record furnished us
does not show it. If so, it was properly overruled, for as
a want of defendants does not appear on the face of the bill,
the objection could not be taken by demurrer. But if the
answer means that the objection was taken to be availed of
at the hearing, the decretal order does not show that it
was then availed of; and as the members of the Club are
numerous, as shown by the answer, and the defendants
fairly represent the interests of all, and a full and complete
decree can be made between the parties before the court
without prejudice to the rights of the other members,—the
objection is not noticed. *Dewey* v. *The St. Albans Trust
Co.*, 60 Vt. 1.

The defendant Skeels being both lessor and lessee in said
lease, which is joint and not several, the suit is properly
brought in chancery, for an action at law could not be
maintained thereon, as Skeels would be on both sides of the
record.

By the deed of March 31, 1890, whereby the orator
conveyed to Marsh all his interest in that part of the
demised premises called the Green lot, his interest in the
lease as to that part, and a proportionate share of the rent,
passed as an incident of the reversion, according to the

maxim, that the incident shall pass by the grant of the principal. The defendants and other members of the Club learned of this conveyance from the land records soon after it was made; but Marsh said nothing to them about it till the spring of 1894, when he leased to them for that year. This was an attornment; and as it involved notice, it was good from the time the rent then in arrear began to accrue, which was subsequent to the conveyance.

At the common law, by some modes of conveyance, the assignment of a reversion expectant on a term for years or for life, was incomplete without the attornment of the tenant. If he refused to attorn, he was not liable to the assignee for rent. But this principle was inconvenient, and a great clog upon transfers, as tenants would sometimes unreasonably refuse to attorn. To remedy this, the 4 Anne, c. 16, made assignments of reversions valid in all cases without attornment, but provided, for the protection of the tenant, that all payments of rent to the lessor before notice of the assignment should be good.

The doctrine of attornment was a product of feudalism, and sprang from the peculiar nature of the feudal bond. Attornment is not necessary under our system of conveyances, to complete the validity of an assignment of a reversion; and therefore, not being applicable to our situation and circumstances, that doctrine was not adopted by our statute as a part of the common law. And although the statute of Anne may not be in force in this state, yet, as the title of the assignee is complete without attornment, we hold on the ground of universal equity, as they do in Massachusetts, that he is entitled to all arrears of rent that accrue after the conveyance and are not paid to the grantor in default of notice, and no more; for if he lies by and suffers the tenant without notice to pay rent to the lessor as it falls due, he has no reason to complain. Indeed this seems to have been the common law when the grant passed the estate without attornment, as it

did in the case of a fine or a deed of uses on which the statute of 27 Henry VIII. operated. In *Birch* v. *Wright*, 1 Term 385, Mr. Justice *Buller* cites *Watts* v. *Ognell*, Cro. Jac. 192, as strong proof of how much equity and good sense have always prevailed in the law. That was debt for rent by the assignee of a reversion under a fine levied to his use. It was objected in arrest of judgment that the declaration was not good, because it was not alleged that the lessee had attorned, nor that he had notice of the use limited; and that even if the assignee might avow without attornment, yet notice ought to be given the lessee, for otherwise he would be at mischief, for the use might be limited and he, not knowing it, might pay rent to his ancient lessor; and that therefore it was not reason that he should be charged without notice, which ought to be shown by the declaration. The court doubted on this point at first, but finally decided that the action was well brought, and that notice need not be alleged. But it agreed that the lessee was not bound to pay without notice, and if he had paid without notice, that it was a good excuse for him, and might be plead; and if he had not paid, that the action gave him notice to pay to the assignee, and then he was chargeable for all that was not paid. Mr. Justice *Buller* says that this case, though decided almost a hundred years before the passage of the statute of Anne, established the same rule that the act professed to make.

The orator cannot, therefore, recover any rent in arrear that accrued on that part of the demised premises deeded to Marsh, as it all accrued after the conveyance. It is unnecessary to inquire as to the efficacy of the actual notice from the land records, as no question is here involved as to rent already paid to the orator.

But as to the rest of the demised premises, which is a part of the farm mortgaged to the insurance company, the case stands on different ground. As the rent in question that accrued thereon, accrued after the company's decree of

foreclosure became absolute, it is unnecessary to consider the rule between mortgagor and mortgagee in respect of rent that accrues on a lease given by the mortgagor subsequent to the mortgage and without the mortgagee's consent. That rule is very different from the one we have been considering. The defendants were not affected by that decree, as they were not parties to the foreclosure; and although the orator's title as mortgagor was thereby taken away, yet he at the same time acquired an interest in the farm by lease from the company, and that interest was continued by annual leases until April 1, 1894, when it ceased in the part covered by the defendants' lease, and the company let it to one of the defendants.

The defendants continued to occupy and pay rent until July 2, 1892, when they abandoned the premises on account of the character of the orator's title, and refused longer to pay rent, and Skeels "took back" his portion of the land; and although he occasionally drove horses on the track that year and the next, it cannot be said, on the facts found, that he did it under the lease. As the orator's new interest was sufficient while it lasted to feed the lease, the defendants could not during its continuance abandon the premises as they did, and their obligation to pay rent continued notwithstanding such abandonment. They could not by anticipation and because they feared, treat the lease as broken by the orator because his interest was not in the first instance sufficient in point of time to feed the lease during the remainder of the term, for he had not renounced the lease, nor was it out of his power to perform, for he was performing, and might continue to perform, for aught the defendants knew. They were bound, therefore, to wait till the breach came, when they could seek such remedy as the lease afforded them; and if it afforded them none, it was their fault that they did not stipulate for one.

The master was unable to find that the orator ever expressly agreed to take back his part of the land, or

otherwise released the defendants from the payment of rent; but he finds that on July 4, 1893, he let the premises, and on his own account, it would seem, to other parties for a celebration, and was paid therefor the sum of four dollars. This he had no right to do if he would still hold the defendants for rent, as it interfered with their right of dominion and control, and therefore it was a resumption of possession by him, and an acceptance of the defendants' abandonment, which worked a surrender of the term by operation of law. *Welcome* v. *Hess*, 90 Cal. 507: 25 Am. St. Rep. 145.

What Skeels did by way of "taking back" his part of the land did not amount to an eviction as matter of law, for the requisite intent does not appear.

The orator, therefore, is entitled to rent for the year ending July 2, 1893, with interest thereon, for that part of the demised premises that is on the home farm. The finding that rent was paid to July 2, 1892, instead of only to March 2, 1892, is well warranted in law.

*Reversed and remanded, with mandate.*